**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KENNETH E. WEAVER,** | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 4:11-CV-00724 |
| | : | |
| vs. | : | (Complaint Filed 4/18/11) |
| | : | |
| **MICHAEL ASTRUE,** | : | |
| **COMMISSIONER OF SOCIAL** | : | (Judge Caputo) |
| **SOCIAL SECURITY,** | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

**BACKGROUND**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Kenneth E. Weaver's claim for social security disability insurance benefits.

On July 17, 2009, Weaver filed protectively[1] an application for disability insurance benefits. Tr. 10, 142, 145-151 and 162.[2] The application was initially denied by the Bureau of Disability Determination[3] on September 15, 2009. Tr. 10, 70 and 71-75. On November 16, 2009, Weaver requested a hearing before an administrative law judge. Tr. 10

---

[1] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2] References to "Tr.\_" are to pages of the administrative record filed by the Defendant as part of his Answer on Jun 21, 2011.

[3] The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 72.

and 78-80.  After about 12 months had passed, a hearing was held on November 2, 2010. Tr. 21-68.  On November 9, 2010, the administrative law judge issued a decision denying Weaver's application. Tr. 10-17.  On January 18, 2011, Weaver filed a request for review with the Appeals Council and on February 18, 2011, the Appeals Council concluded that there was no basis upon which to grant Weaver's request. Tr. 1-6 and 217-219.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Weaver then filed a complaint in this court on April 18, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on August 29, 2011,  when Weaver elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Weaver meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 10, 12, 154 and 162.

Weaver, who was born in the United States on January 24, 1957, withdrew from high school in 1974 after completing the 11th grade and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 45, 142, 145, 191 and 196.  During Weaver's elementary and secondary schooling, he attended regular education classes. Tr. 196.  Although Weaver did not obtain a General Equivalency

---

[4] Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

Diploma, he completed training in the operation of heavy equipment. Tr. 50 and 196.

Weaver has past relevant employment[5] as a painter and drywall installer. Tr. 60. The painter position is classified as skilled, medium work, as customarily performed and skilled, heavy work as actually performed by Weaver, and the drywall installer position is classified as skilled, heavy work as customarily performed and as actually performed by Weaver. [6] Id.

---

[5] Past relevant employment in the present case means work performed by Weaver during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

[6] The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
>
> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
>
> (c) *Medium work*. Medium work involves lifting no

3

Weaver alleges that he became disabled on August 27, 2008, because of cirrhosis of the liver, hepatitis C, grade 1 esophageal varices, gastritis, and a history of blood transfusions. Tr. 24. The record reveals that Weaver had two acute episodes of gastrointestinal bleeding caused by the abuse of alcohol and the consumption of non-steroidal anti-inflammatory drugs. Tr. 26-33. The acute episodes occurred on July 7, 2009, and July 30, 2010. Id. Between those two episodes, Weaver admitted he had very little medical treatment and was told by his physicians to stop consuming alcohol and non-steroidal anti-inflammatory drugs. Tr. 52. Weaver admitted that after the first episode, he did not follow that advice.[7] Tr. 53.

---

> more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.
>
> (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

[7]The record reveals that Weaver has a significant and "longstanding" history of abusing alcohol. Tr. 232 and 238. In July 2009, he was drinking 8 to 12 beers daily and his history of alcohol consumption spanned a 20 year period. Tr. 238. He also was smoking a pack of cigarettes per day. Id. It was noted that he was not a candidate for treatment of his hepatitis C because of his alcohol abuse. Tr. 240. Prior to the July 7, 2009, episode of gastrointestinal bleeding Weaver "drank heavier" than usual "over the weekend" when "he was camping with his son[.]". Tr. 231 and 238. In a medical record authored by Robert Levy, D.O., a treating physician, dated August 27, 2009, it was stated that "since [Weaver's] discharge [from the hospital in July] he has not had any further bleeding. He . . . continues to drink approximately 4 beers daily despite previous recommendations. . . He denies any confusion or abdominal swelling." Tr. 353. In February, 2010, Dr. Levy reported that Weaver "denies any symptoms to suggest decompensation of his liver disease . . .

When asked by the administrative law judge at the hearing on November 2, 2010, why he was unable to work, Weaver responded by stating that he gets "winded easy" and "dizzy if he crawl[s] up a ladder." Tr. 53.  Weaver further stated that he is unable to "stay on [his] hunkers [knees] very long" and "sit too long." Id.   Weaver also claimed he could not walk or stand for more than couple of hours at a time; and  that he suffers from fatigue. Tr. 54.   Weaver admitted that he could lift 25 pounds. Tr. 55.

In a document filed with the Social Security Administration in conjunction with Weaver's application for benefits, Weaver indicated he stopped working on August 27, 2008, because he was laid off from his position as a painter and that he had not worked since that date. Tr. 192. Weaver furthermore when interviewed on July 2, 2009, by an employee of the Social Security Administration stated that he last worked on August 27, 2008; he was laid off; and he was receiving $548.00 biweekly in unemployment compensation benefits. Tr. 142.

Records of the Social Security Administration reveal that Weaver had reported earnings in 1970 through 1979, 1981 through 1985, 1987 through 1998, and 2001 through 2008. tr. 155.  Weaver's total earnings during those years were $ 344,963.64. Id.  Weaver has no reported earnings after 2008 other than unemployment compensation benefits.[8] Tr.

---

There are no complaints of confusion.  He denies abdominal or lower extremity swelling.  He has not experienced any further GI bleeding.  Unfortunately [Weaver] informs me he continues to drink alcohol." Tr. 344.

[8]Weaver received unemployment compensation benefits during the 4th quarter of 2008 in the amount of $1792.00, the 1st quarter of 2009 in the amount of $3288.00, and the 2nd quarter of 2009 in the amount of $1370.00. Tr. 153.  He also received unemployment compensation benefits in 2010.  At the administrative hearing on November 2, 2010, Weaver admitted after several questions from the administrative law judge that he was receiving unemployment compensation benefits. Tr. 46-47.  Weaver admitted that

153 and 16-161.

After the alleged disability onset date, the record reveals that Weaver lived in a mobile home by himself. Tr. 173.  Weaver was able to take care of his daily personal needs, including dressing, bathing, caring for his hair, shaving, and feeding himself. Tr. 174. Weaver took care of a dog by himself. Id.   Weaver was able to watch TV and talk on the telephone with no difficulty. Tr. 173.  Weaver admitted he needed no special reminders with respect to taking medicines; he was able to prepare meals; perform routine cleaning and do his laundry; he admitted having the ability to mow his lawn using a riding lawn mower; he needs no encouragement to engage in daily activities; he goes outside everyday; he is able to drive a motor vehicle; he shops for food and personal items; he is able to pay bills, count change, handle a saving count, and use a checkbook and money orders; he admitted that he still goes camping and fishing but not as often; and he admitted socializing with friends. Tr. 175-178.  When asked to specify the functional abilities which his physical impairments impact, Weaver indicating lifting, walking and stair climbing. Tr. 178.  He did not note any problem with squatting, bending, standing, reaching, sitting, kneeling, talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, or getting along with others. Id.

For the reasons set forth below we will affirm the decision of the Commissioner denying Weaver disability insurance benefits.

---

when he initially applied for unemployment compensation benefits and when he contacted the unemployment compensation office thereafter on a biweekly basis as part of his job search,  that he stated he was available and able to work and that the type of work he was able to do was light duty construction work, including sanding and caulking. Tr. 47-48.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately

developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

>engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his

---

[9] If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[10] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

[11] If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful

or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Weaver had not engaged in substantial gainful work activity since August 27, 2008, the alleged disability onset date.[13] Tr. 12

---

activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[12]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

[13]The administrative law judge stated that "[t]he claimant worked after the alleged disability onset date but [that] work did not rise to the level of substantial gainful activity (Exhibit 6D)." Tr. 12. Weaver testified that he did not work after August 27, 2008. Tr. 48-49. Exhibit 6D (Tr. 157-159) does not indicate that Weaver worked after August 27, 2008. It merely states that in 2008 Weaver's total earnings were $10801.13. Tr. 159. There is an Exhibit 10E which does suggest that Weaver worked after August 27th. Tr. 215. That

At step two of the sequential evaluation process, the administrative law judge found that Weaver had the following severe impairments: "Cirrhosis of the liver Secondary to Hepatitis C, Alcohol Abuse prior to July 2010, Esophageal Varices and Gastrointestinal Bleeding[.]" Tr. 12.

At step three of the sequential evaluation process the administrative law judge found that Weaver's impairments did not individually or in combination meet or equal a listed impairment. Tr. 13.  In so finding the administrative law judge relied on the opinion of Garrett Dixon, M.D., who reviewed Weaver's medical records and testified at the administrative hearing. Id.

At step four of the sequential evaluation process the administrative law judge found that Weaver could not perform his prior relevant medium to heavy work but that he had the residual functional capacity to perform a limited range of unskilled, light work.  Tr. 13-16.  Specifically, the administrative law judge found that Weaver could perform unskilled, light work which involved

> normal breaks throughout the 8 hour work day and restroom breaks must be readily available.  The claimant is limited to never climbing ropes, ladders, scaffolds or poles. The claimant is limited to never working in high exposed places. The claimant is limited to occasionally working around fast moving machinery on the ground.  The claimant is limited to never working around or with sharp objects.

Tr. 13.  In concluding that Weaver had the residual functional capacity to engage in this limited range of unskilled, light work, the administrative law judge relied, *inter alia*, on the opinion of Dr. Garrett and the opinion of Carla Huitt, M.D., who reviewed Weaver's medical

---

exhibit indicates that Weaver worked as a "beam painter" from 2007 to 2009. Id.

11


records on behalf of the Bureau of Disability Determination.  No treating or examining physician provided a statement of Weaver's work-related functional abilities or a statement that Weaver was either limited functionally or totally disabled.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Weaver had the ability to perform unskilled, light work as a cashier and office cleaner, and that there were a significant number of such jobs in the national, state and local economies. Tr. 17.

The administrative record in this case is 391 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an adequate job of reviewing Weaver's vocational history and medical records in her decision. Tr. 10-17. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 12, Brief of Defendant.

Weaver argues that the administrative law judge erred (1) when she found that Weaver's "allegations of fatigue and pain were not related to any medically determinable impairment and were not credible as well as failing to adequately discuss why she rejected such allegations," and (2) "in placing substantial weight on the opinion of the medical examiner Dr. Dixon, when Dr. Dixon testified that the record did not have enough documentation to determine whether or not [Weaver] met or equaled a listing."  We find no merit in Weaver's arguments.

The Social Security regulations require that an applicant for disability benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing

how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. §§ 404.1512(c) and 416.912(c). Weaver failed to provide such evidence. No treating or examining physician provided a statement that Weaver met the requirements of a listing.  Also, no treating physician offered an opinion as to how Weaver's impairments limited his functional capabilities or ability to work and the bare medical records do not support Weaver's claim of disability.  No physician who treated Weaver indicated that Weaver was disabled for the requisite 12 month period required by the statute.[14]

In contrast, Dr. Gannett's testimony clearly supports the administrative law judge's determination at steps three and four of the sequential evaluation process.  Dr. Gannett testified in relevant part as follows:

> Q. Doctor, is there sufficient evidence in this record to allow you to [form] an opinion of the claimant's medical status within your area of expertise on or after August 27, 2008.
>
> A. Yes.
>
> \*       \*       \*       \*       \*       \*       \*
>
> [Weaver has] a number of impairments. The primary one is cirrhosis of the liver associated with esophageal varices . . . He has a history of hepatitis C.  He has a history of alcohol abuse.  Then he has episodic hemorrhagic gastritis with result (sic) in acute anemia necessitating transfusions.[15]

---

[14]As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

[15]Hemorrhagic gastritis is bleeding from the lining of the stomach. Esophageal varices are dilated veins in the lower third of the esophagus. They are generally a sign of

> \*   \*   \*   \*   \*   \*   \*
>
> Q. . . what symptoms did you find in this record, sir, associated with this medically determinable impairment [referring to cirrhosis of the liver with esophageal varices] ?
>
> A. There were no symptoms associated with it.
>
> Q. Not even something like fatigue?
>
> A. I didn't see any report by the patient of, of fatigue. . .  I did not find any in the medical record.
>
> Q. . . . with regard to the hepatitis C history, any symptoms established in this record?
>
> A. No, no symptoms.
>
> Q. And the alcohol abuse? . . . .
>
> A. No symptoms established. . . .
>
> Q. . . . How about the hemorrhagic gastritis with acute anemia . . . ?
>
> A.  No . . . there was an acute illness precipitated by bloody, tarry bowel movements and some vomiting blood which are signs. I wouldn't say there were symptoms.
>
> Q.  . . . You've referred to basically as far as I can tell two acute incidents, is that correct?
>
> A. That's correct. . . .  So [there] were two episodes of, of acute illness - -  . . . clearly related to a combination of alcohol use and non steroidal use irritating the stomach wall that, that necessitated intensive treatment, but there was no evidence in between those times of any other health issues that I could find in the record.

---

portal hypertension caused by cirrhosis of the liver.  As a result of cirrhosis of the liver blood does not as readily flow through the liver resulting in an increase of  blood flowing through the veins of the esophagus.  This extra flow through the veins of the esophagus increases the pressure in those veins causing them to dilate.  In extreme cases, there can be bleeding from the dilated veins.  The varices are generally designated either grade 1 (small), grade 2 (medium) and grade 3 (large). The medical records indicate Weaver had non-bleeding grade 1 varices.  Tr. 241.

>   \*       \*       \*       \*       \*       \*       \*
>
>   Q. . . . now let me turn to the listings themselves . . . do the claimant's impairments taken individually and in combination meet the requirements of a listed impairment for any or all of the period at issue?
>
>   A. No, they did not.
>
>   Q. . . . did the claimant's impairments taken individually or in combination equal an (sic) severe – any impairment?
>
>   A No.

Tr. 26-37. During his testimony Dr. Gannett also indicated that it was his opinion that there was "no evidence of functional limitations documented in the record" and Weaver could engage in at least a limited range of medium work. Tr. 38-40.

Also, contained within the record is a statement from J. Brenner, D.O., an osteopathic physician, that Weaver's "bleeding was secondary to hemorrhagic gastritis and not from varices" and that "there is no evidence he was hemodynamically unstable." Tr. 252. Dr. Brenner further stated that Weaver's impairments did not meet listing 5.05A (Chronic liver disease with hemorrhaging from esophageal, gastric, or ectopic varices or from portal hypertensive gastropathy, demonstrated by endoscopy).

In addition to Dr. Gannett, the administrative law judge's RFC assessment is supported by the opinion of Dr. Huitt who concluded that Weaver had the functional ability to engage in the full-range of light work. Tr. 253-259.

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. An impairment, whether

physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements. 20 C.F.R. § 404.1508 (2007). We have no opinion from any treating physicians regarding Weaver's work-related physical functioning. Consequently, we are left with Weaver's subjective complaints of pain and fatigue. Weaver's self-reported activities and abilities demonstrate that he was not physically impaired to the point that he could not engage in any type of work. Weaver as stated earlier engaged in many activities, including caring for his personal needs independently, driving, shopping and camping. The record also reveals that in March, 2009, he was playing ping-pong which is inconsistent with his claims of debilitating fatigue and pain. Tr. 222. Under the circumstances, the administrative law judge appropriately considered Weaver's physical limitations when setting Weaver's residual functional capacity.

The administrative law judge appropriately relied on the opinions of Dr. Gannet and Dr. Huitt. The administrative law judge's reliance on those two opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"). The administrative law judge appropriately took into account Weaver's functional limitations in the residual functional capacity assessment.

The administrative law judge stated that Weaver's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, light work. Tr. 17. The administrative law judge was not required to accept Weaver's subjective claims regarding his physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir.

1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Weaver when he testified at the hearing on November 2, 2010, the administrative law judge is the one best suited to assess the credibility of Weaver.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

<div style="text-align: right;">

s/A.Richard Caputo
A. RICHARD CAPUTO
United States District Judge

</div>

Dated: June  14, 2012